

FILED & ENTERED

SEP 13 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA—LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Bhavneet K. Bhogal, Debtor. | Case No.: 2:22-bk-10618-ER |
| Crossroad Exchange, LLC, Equity Stock Corporation, and Niki-Alexander Shetty,<br><br>Plaintiffs,<br><br>v.<br><br>Bhavneet K. Bhogal,<br><br>Defendant. | Adv. No.: 2:22-ap-01062-ER<br><br>**MEMORANDUM OF DECISION FINDING THAT PLAINTIFFS ARE NOT ENTITLED TO A JUDGMENT DENYING THE DEBTOR'S DISCHARGE**<br><br>**TRIAL:**<br><br>Date:    May 22, 2023<br>Time:    9:00 a.m.<br>Location: Ctrm. 1568<br>            Roybal Federal Building<br>            255 East Temple Street<br>            Los Angeles, CA 90012 |

## I. Introduction

Plaintiffs Crossroad Exchange, LLC ("Crossroad"), Equity Stock Corporation ("Equity"), and Niki-Alexander Shetty ("Shetty," and together with Crossroad and Equity, the "Plaintiffs") seek a judgment denying the discharge of Debtor Bhavneet K. Bhogal (the "Debtor") pursuant to § 727(a)(2)(A) and § 727(a)(4)(A).

Trial was conducted on May 22, 2023.[1] Plaintiffs and the Debtor filed closing briefs on July 28, 2023.[2] This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Civil Rule 52,[3] made applicable to these proceedings by Bankruptcy Rule 7052.[4]

---

[1] A transcript of the trial proceedings is available as docket entry 75 and is cited as "Tr."
[2] *See* Adv. Doc. No. 76 (Plaintiffs' closing brief) and Adv. Doc. No. 77 (Debtor's closing brief).
[3] To the extent any of the findings of fact set forth in Section II, below, should more appropriately be construed as conclusions of law, they shall be deemed as such. To the extent

For the reasons set forth below, the Court finds that Plaintiffs have failed to establish that they are entitled to a judgment denying the Debtor's discharge. The Court will enter judgment in favor of the Debtor.

## II. Findings of Fact

The Debtor filed a voluntary Chapter 7 petition on February 3, 2022 (the "Petition Date"). At the time of the filing of the petition, the Debtor was depressed and physically and emotionally exhausted as a result of the recent death of her late husband, Surinder S. Bhogal ("Mr. Bhogal"). Mr. Bhogal was diagnosed with cancer and underwent surgery to remove a brain tumor in March 2018.[5] Testing conducted in 2019 revealed that the tumor had returned.[6] Brain surgery conducted in November 2019 failed to arrest the spread of the cancer and resulted in additional complications, including swelling in Mr. Bhogal's brain from a wound that had not healed properly.[7] Further operations, extensive hospitalization, and chemotherapy became necessary beginning in late 2019 and continuing throughout 2020 and 2021.[8]

Mr. Bhogal died on May 19, 2021.[9] At the time of his death, the Debtor and Mr. Bhogal had been "married over 26 years."[10] They had a "very close" relationship, and had "three children together," all of whom still live with the Debtor.[11]

Mr. Bhogal's mother (the Debtor's mother-in-law) lived with the Debtor during the time that Mr. Bhogal was experiencing serious health issues. After Mr. Bhogal died, his mother "lost a purpose in her life, and she started having a lot of problems with remembering things, and she got diagnosed with dementia, and she really went downhill very fast."[12] Caring for Mr. Bhogal's mother imposed additional demands and stress upon the Debtor. Because the mother "requires 24-hour help," the Debtor was required to hire "an Indian lady who can speak in that language to help her."[13]

Before he began experiencing serious health issues, Mr. Bhogal was the family's primary breadwinner. Mr. Bhogal conducted business in the hospitality industry, and held interests in hotel properties located in Oklahoma and Michigan.[14] Mr. Bhogal's health problems prevented

---

any of the conclusions of law set forth in Section III, below, should more appropriately be construed as findings of fact, they shall be deemed as such.
[4] Unless otherwise indicated, all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1–86; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037; all "Evidence Rule" references are to the Federal Rules of Evidence, Rules 101–1103; all "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1–9075-1; and all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.
[5] Tr. at 52:12–53:4 (testimony of the Debtor).
[6] *Id*. at 53:7–8 (testimony of the Debtor).
[7] *Id*. at 53:10–24 (testimony of the Debtor).
[8] *Id*. at 54:1–55:1 and 60:22–61:12 (testimony of the Debtor).
[9] *Id*. at 48:24–25 (testimony of the Debtor).
[10] *Id*. at 48:22–23 (testimony of the Debtor).
[11] *Id*. at 49:1–16 (testimony of the Debtor).
[12] *Id*. at 65:17–21 (testimony of the Debtor).
[13] *Id*. at 62:22–63:5 (testimony of the Debtor).
[14] *Id*. at 55:5–12 (testimony of the Debtor).

him from adequately attending to the operations of his business interests. On December 9, 2021, Plaintiff Crossroad recorded in California an Oklahoma judgment in the amount of $659,317.55 that it had obtained against the Debtor and Mr. Bhogal's probate estate,[15] and on January 6, 2022, Plaintiff Equity recorded in California an Oklahoma judgment in the amount of $2,595,891.39 that it had obtained against the Debtor and Mr. Bhogal's probate estate (the "Judgments").[16] Plaintiff Shetty has not obtained a judgment against the Debtor and Mr. Bhogal's estate, but did file a complaint against the Debtor and Mr. Bhogal's estate that remains pending in the Los Angeles Superior Court.[17]

The loss of Mr. Bhogal's income put the Debtor at risk of losing the home (the "Property")[18] that she and her family had lived in since 2002.[19] The Debtor was determined to save the Property because it had been designed by Mr. Bhogal:

> And then when I lost him, I said no matter what, I have to save his legacy. He built that house. Every corner of it reminds me of him. So I said that I'm going to be brave. I'm going to fight for it, and I'm going to survive.[20]

To earn sufficient income to retain the Property, the Debtor significantly increased her working hours. The Debtor has worked as an occupational therapist since 1999.[21] As of 2021, she was working "twelve to fourteen hours a day, seven days a week."[22] The Debtor was able to increase her working hours because "there was a lot of work available" as a result of the COVID-19 pandemic.[23]

In October 2021, the Debtor obtained preliminary approval of a loan modification on the Property.[24] Final approval of the loan modification was contingent upon the Debtor making three on-time payments of the mortgage, property taxes, and insurance.[25] The Debtor was concerned that Plaintiffs might levy against her personal bank account, thereby preventing her from making the payments necessary to secure final approval of the loan modification. This concern arose from the fact that in December 2020, Plaintiffs had seized approximately $20,000 from the Debtor's retirement account.[26] (The seized funds were later returned to the Debtor because they had been levied from an exempt retirement account.)

Acting upon the advice of Steve Madoni ("Madoni"), the attorney who had assisted the Debtor in recovering the funds wrongfully levied from her retirement account, the Debtor transferred $16,500 from her personal bank account to (a) the bank accounts of her adult children Kharan Bhogal and Simran Bhogal and (b) a bank account in the name of the Debtor's wholly-

---

[15] Proof of Claim 10-1.
[16] Proof of Claim 11-2.
[17] Proof of Claim 12-1. Plaintiff Shetty's complaint has been assigned Case No. 19PSCV00967.
[18] The Property is located at 23415 Pleasant Meadow Road, Diamond Bar, CA 91765.
[19] Tr. at 50:3–5 (testimony of the Debtor).
[20] *Id*. at 72:17–20 (testimony of the Debtor).
[21] *Id*. at 50:11–14 (testimony of the Debtor).
[22] *Id*. at 58:15–16 (testimony of the Debtor).
[23] *Id*. at 59:9–12 (testimony of the Debtor).
[24] *Id*. at 64:11–65:8 (testimony of the Debtor).
[25] *Id.*
[26] Plaintiff's Ex. 1 (Transcript of § 341(a) Meeting) at 18:15–19:6 (testimony of the Debtor).

owned company, Bhavneet Kaur.[27] The transfers occurred between October 2021 and November 2021.[28] The full $16,500 was ultimately transferred to the Debtor's son Kharan Bhogal, who used the funds to contribute toward making three month's worth of mortgage and property tax payments on the Property.[29] The $16,500 was not sufficient to cover the entirety of the three mortgage payments (totaling $15,383.28)[30] and property taxes (totaling $8,959.64).[31]

The Debtor explained the reason for the transfers as follows:

> All I know was that one day, when you open your bank account and your balance is zero, it freaks you out. And I was going through the loan modification, and those payments were very important to me. I cannot take the chance that I sent out 6,000 or 5,000 payment, and here, my bank balance is zero….
> All I know is that my attorney, current attorney, when I discussed the matter with him, he recommended that I can put the money into another account to make sure I can pay my bills. That's all I did.[32]

The Debtor obtained final approval of the loan modification in January 2022.[33] In late January 2022, Madoni informed the Debtor that Plaintiffs Crossroad and Equity were seeking to enforce the Judgments against her, and advised the Debtor to file for bankruptcy.[34] Madoni told the Debtor that the situation was urgent and recommended that she take action immediately:

> He [Madoni] told me that—he said just to make you understand, let me explain it this way. He said, "your house is on fire, and you need to put this fire down." So he said I have two choices, either I go to Oklahoma, fight for the judgment that Niki Shetty got against me in Oklahoma…. And he said that so either I go, keep working like this, twelve, fourteen hours every day, keep fighting all these lawsuits, go to Oklahoma, fight these judgments, try to stop this, or I file bankruptcy and have peace of mind, start fresh. He said I know that you worked very hard to protect this house, but he said that you're going to lose this house. And he said if I am your son, I would recommend that you go for the bankruptcy. He said that bankruptcy was my only option at that time.[35]

The urgency of the situation was made more evident to the Debtor by the fact that Madoni, whom the Debtor usually had difficulty reaching, was "texting me [the Debtor] every morning" to find out whether the Debtor had filed her bankruptcy petition.[36]

The Debtor and her children met with bankruptcy attorney Gary Polston ("Polston") on January 31, 2022.[37] The Debtor told Polston that it was critical that the bankruptcy petition be

---

[27] Tr. at 65:2–69:8 (testimony of the Debtor).
[28] Bankr. Doc. No. 113 (Debtor's Ex. E) (Amended Statement of Financial Affairs) at ¶ 18.
[29] Tr. at 67:10–18 (testimony of the Debtor).
[30] Bankr. Doc. No. 113 (Debtor's Ex. E) (Amended Statement of Financial Affairs) at ¶ 6.
[31] Id
[32] Tr. at 8:18–23 and 9:11–14 (testimony of the Debtor).
[33] Id. at 70:4–5 (testimony of the Debtor).
[34] Id. at 70:9–71:19 (testimony of the Debtor).
[35] Id. at 70:11–71:1 (testimony of the Debtor).
[36] Id. at 76:24–77:44 (testimony of the Debtor).

filed immediately.[37] Polston's normal practice is "to spend a week-and-a-half to two weeks with the client" before filing a bankruptcy petition,[39] and he had "huge concerns" about filing a petition on the shortened timeframe requested by the Debtor because "[y]ou can't get all that information in within a day or two."[40] Notwithstanding these concerns, Polston agreed to accept the Debtor as a client and rapidly file the petition because "it was just expressed to me it [the bankruptcy filing] had to get done."[41] The Debtor's Chapter 7 petition was filed on February 3, 2022, three days after she met with Polston.[42]

The petition contained numerous errors and omissions, including errors unfavorable to the Debtor. For example, the initial petition claimed a homestead exemption of only $170,350, rather than the higher $600,000 exemption claimed in later amendments. As explained by Polston:

> **Question (by Debtor's counsel):** I believe there was a question on the schedules that asked Ms. Bhogal [the Debtor] whether or not she was claiming an exemption of more than $170,350?
> **Answer (by Polston):** Yes, and we said no. That was an error on my part. I used the 703 exemptions instead of the 704 exemptions, which would have given her a full 600,000. So in my rush to get this done, I used the wrong exemptions. I found that out basically the day of the 341(a) hearing.
> **Question (by Debtor's counsel):** Okay. And did you also make that same error in connection with the exemptions for her personal property?
> **Answer (by Polston):** Basically, I chose the wrong set of exemptions, so I would have—when we did the amendment, I would have gone from the 703 to the 704 exemptions…. And I believe it was the trustee who pointed that out to me, so it was just one of the amendments I would be making.[43]

The initial § 341(a) meeting of creditors took place on March 8, 2022. At that meeting, the Debtor provided testimony that disclosed the majority of the material omissions and corrected the majority of the material errors in her petition and schedules, as follows:

1) The Debtor disclosed the recordation of a deed of trust against the Property in the amount of $100,000 in favor of attorneys Steve Madoni and Christina Bateman.[44]
2) The Debtor disclosed that she had made all the required mortgage payments on the Property during the three-month period prior to the Petition Date.[45]
3) The Debtor disclosed that she had been making monthly payments totaling approximately $560 on six life insurance policies held by her three children.[46]

---

[37] *Id.* at 74:18–20 (testimony of the Debtor).
[38] *Id.* at 121:24–122:1 (testimony of Polston).
[39] *Id.* at 126:20–22 (testimony of Polston).
[40] *Id.* at 123:7–8 (testimony of Polston).
[41] *Id.* at 124:20–21 (testimony of Polston).
[42] Bankr. Doc. No. 1.
[43] Tr. at 128:11–129:3 (testimony of Polston).
[44] Plaintiff's Ex. 1 (Transcript of § 341(a) Meeting) at 9:19–24 (testimony of the Debtor).
[45] *Id.* at 22:21–23–4 (testimony of the Debtor).
[46] *Id.* at 21:4–22:1 (testimony of the Debtor).

4) The Debtor disclosed that she had transferred funds to her children prior to the Petition Date because she was concerned that Plaintiffs would levy upon her personal bank account.[47]
5) The Debtor disclosed the pre-petition transfer of a 2015 Cadillac Escalade to her daughter Simran Bhogal.[48]
6) The Debtor disclosed the existence of the Surinder Bhogal and Bhavneet Bhogal Trust.[49]
7) The Debtor disclosed that she was licensed by the State of California to practice as an occupational therapist.[50] (The Debtor's original Schedule I disclosed her employment as an occupational therapist, but her original Schedule A/B did not disclose her professional license in response to Question 27, which requires the disclosure of professional licenses.)

On May 12, 2022, the Debtor filed amended schedules (the "May 2022 Amendment")[51] that disclosed all of the information set forth in the list above, except for (a) the pre-petition mortgage payments on the Property (#2 above) and (b) the Debtor's pre-petition transfers to her children (#4 above). Polston testified that he inadvertently neglected to include the pre-petition mortgage payments (#2 above) in the May 2022 Amendment.[52] He further testified that the May 2022 Amendment did not include the Debtor's pre-petition transfers to her children (#4 above) because he deemed the transfers to constitute mortgage payments:

> **Question (by Debtor's counsel):** Now, you attended the 341 meeting, when you heard testimony by [the Debtor] that she had transferred funds to her children so she could pay her bills and expenses. Was there a reason in May of 2022, when you filed the amendment, that you did not include those transfers?
> **Answer (by** Polston**):** I just viewed those as they were mortgage payments. The family, especially after her husband's death, kind of practiced a communalism of some—they all worked together just to keep the ship moving forward. So I would have listed them as mortgage payments versus transfers that then became mortgage payments. I knew [the Debtor] with her work schedule and was basically relying on her kids to get things done, to keep things moving forward, whether it was shopping for groceries or whether it was getting bills paid. So I didn't see it as a "transfer" that was benefitting them. It was more of a, "Here is a check. Please forward that to the mortgage company."[53]

---

[47] *Id.* at 3:17–4:16 (testimony of the Debtor).
[48] *Id.* at 4:17–5:17 (testimony of the Debtor).
[49] *Id.* at 6:17–7:8 (testimony of the Debtor).
[50] *Id.* at 19:10–15 (testimony of the Debtor).
[51] Bankr. Doc. No. 40 (Plaintiff's Ex. 3).
[52] Tr. at 134:25–135:11 (testimony of Polston).
[53] *Id.* at 135:22–136:13.

On May 8, 2023, the Debtor further amended her schedules (the "May 2023 Amendment").[54] The May 2023 Amendment disclosed all of the pre-petition mortgage payments on the Property and the Debtor's pre-petition transfers to her children.

On December 8, 2022, upon the motion of the Chapter 7 Trustee (the "Trustee"), the Court entered an order approving the sale the Property for $2.5 million.[55] The sale closed on December 29, 2022.[56]

On August 20, 2021—prior to the Petition Date—Plaintiff Equity obtained a writ of attachment against the Property in the San Diego Superior Court. Prior to the entry of the order authorizing the sale, the Court approved a stipulation between the Trustee and Equity resolving Equity's claims against the Property and the estate (the "Equity Stipulation").[57] Under the Equity Stipulation, Equity was deemed to hold an allowed claim against the estate in the amount of $2,451,09.20. Equity's claim was deemed to be secured by the Property to the extent set forth in the Equity Stipulation.[58] Upon the closing of the sale of the Property, Equity was paid $503,914.58 on account of the secured portion of its claim.[59] The Debtor's bankruptcy estate received $215,963.40 in net proceeds from the sale.[60] Those funds have not yet been paid to creditors because the Trustee is still administering the estate.

## III. Conclusions of Law
### A. Plaintiffs Are Not Entitled to a Judgment Denying the Debtor's Discharge Pursuant to § 727(a)(2)(A)

Under § 727(a)(2)(A), a discharge may be denied where "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition."

"A party seeking denial of discharge under § 727(a)(2) must prove two things: '(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property.' A debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2). Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor." *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010) (internal citations omitted).

A debtor's decision to preferentially pay certain creditors prior to seeking bankruptcy protection is not grounds for denying a discharge. *Hultman v. Tevis*, 82 F.2d 940, 941 (9th Cir.

---

[54] Bankr. Doc. No. 113.

[55] Bankr. Doc. No. 88.

[56] Bankr. Doc. No. 101 (report of sale submitted by the Trustee pursuant to Bankruptcy Rule 6004(f)(1)).

[57] Bankr. Doc. No. 45 (Equity Stipulation) and Bankr. Doc. No. 53 (order approving Equity Stipulation).

[58] The Equity Stipulation provided that the amount of Equity's secured claim would be calculated based upon the selling price of the Property.

[59] Bankr. Doc. No. 101 (report of sale submitted by the Trustee pursuant to Bankruptcy Rule 6004(f)(1)).

[60] *Id.*

1936). In *Hultman*, within the year preceding his bankruptcy, the debtor used money he received from a spendthrift trust to partially pay a large debt owed to his son. 82 F.2d at 941. Prior to making the payment, the debtor's attorney advised him that the money received from the trust could not be taken by his creditors, even after it reached his hands. *Id.* In litigation in his bankruptcy case, a special master found that:

> The bankrupt, in good faith, believed and relied on his attorneys' advice and acted on it in making the transfer to his son. Furthermore, the amount of money so transferred was less than the amount then owing by the bankrupt to his son. The mere fact a bankrupt has made a preferential payment or transfer to one of his creditors is no ground for denying a discharge.

*Id.* Based upon these findings, the district court rejected the trustee's objection to the debtor's discharge. *Id.* On appeal by the trustee to the Ninth Circuit, the master's findings of fact were not challenged by the trustee, and were accepted by the Ninth Circuit. *Id.*

The Eleventh Circuit adopted *Hultman*'s reasoning in *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir. 1994). In *Miller*, the debtor transferred nine properties to her largest creditor in exchange for the cancellation of unsecured debt. *Id.* at 307. The court held that a "mere preferential transfer of this sort is not tantamount to a fraudulent transfer for the purposes of denying discharge." *Id.*

Here, the Debtor transferred funds out of her personal bank account to insure that the funds would be available to pay the mortgage and taxes on the Property, and the entirety of the $16,500 that the Debtor transferred was in fact used to make mortgage and tax payments on the Property. However, in contrast to most pre-petition transfers, this transfer ultimately benefitted all of the Debtor's creditors (not just the creditor who received the transfer), because it prevented the Property from being lost to foreclosure, thereby allowing the Trustee to administer the Property for the benefit of the estate. Sale of the Property netted $215,963.40 that will be available for distribution to creditors, including Plaintiffs, and Plaintiff Equity has already been paid $503,914.58 on account of its secured claim against the Property.

Because the Debtor's transfers benefitted all creditors, the holdings of *Hultman* and *Miller* apply with even greater force to the instant case. In addition, like the debtor in *Hultman*, the Debtor here made the transfers in reliance upon the advice of her attorney. The result is that Plaintiffs are not entitled to a judgment denying the Debtor's discharge under § 727(a)(2)(A).

Unpublished cases decided within the Ninth Circuit declining to apply the reasoning of *Hultman* and *Miller* are easily distinguishable. In *Ellison v. JP Morgan Chase Bank, N.A. (In re Ellison)*, No. 2:14-BK-24463-RK, 2017 WL 3976304 (B.A.P. 9th Cir. Sept. 8, 2017), *aff'd,* 758 F. App'x 615 (9th Cir. 2019), the court held that a debtor who had made five months' worth of pre-payments on his mortgage was not entitled to a discharge. Unlike in the present case, the debtor in *Ellison* had recently refinanced the property for the purpose of shielding non-exempt equity from creditors. *Ellison*, 2017 WL 3976304 at *9. Further distinguishing *Ellison* from the instant case is the fact that the *Ellison* debtor made substantial pre-payments on the mortgage. Here, by contrast, the Debtor *reduced* her monthly mortgage payments by obtaining the loan modification.

Similarly, in *Perrine v. Speier (In re Perrine)*, No. ADV. RS 05-01473PC, 2008 WL 8448835 (B.A.P. 9th Cir. July 10, 2008), the court held that a debtor's pre-petition transfer of real property to an attorney disqualified him from receiving a discharge. The *Perrine* court's

holding rested on the fact that the value of the transferred property was significantly greater than the debt owed to the attorney, and that the effect of the transfer was to remove the debtor's only non-exempt equity from the reach of creditors. *Perrine*, 2008 WL 8448835 at *6. No comparable facts are present here.

## B. Plaintiffs Are Not Entitled to a Judgment Denying the Debtor's Discharge Pursuant to § 727(a)(4)(A)

Under § 727(a)(4)(A), a debtor who "knowingly and fraudulently" makes a false oath or account in connection with the case is not entitled to a discharge. "In order to bring a successful § 727(a)(4)(A) claim for false oath, the plaintiff must show: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. A claim for denial of a discharge under § 727 is construed liberally in favor of the discharge and strictly against a person objecting to the discharge." *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005), *aff'd and remanded,* 241 F. App'x 420 (9th Cir. 2007) (internal citations omitted). "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999).

For purposes of the § 727(a)(4)(A) discharge exception, a "fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'" *Khalil v. Developers Surety & Indem. Co. (In re Khalil)*, 379 B.R. 163, 173 (B.A.P. 9th Cir. 2007), *aff'd,* 578 F.3d 1167 (9th Cir. 2009) (internal citation omitted). A false oath or account is made "knowingly" if the debtor "acts deliberately and consciously." *Id.*

To determine whether the false oath or account was made "fraudulently," the Court may consider "circumstantial evidence or inferences drawn from the debtor's course of conduct." *Id.* at 174. As explained in *Khalil*:

> "Neither sloppiness nor an absence of effort by the debtor supports, *by itself,* an inference of fraud. Courts which hold otherwise are simply devising a court-made prophylactic rule that the debtor must make substantial effort to provide accurate and complete schedules. Had the Congress intended to make such a rule, it could have done so easily, as it did with § 727(a)(3) (failure to keep adequate books and records), and (a)(5) (failure to adequately explain the loss of assets), neither of which have an express element of fraudulent intent. [Citation omitted.] But the Congress did not do so, and it is not for the courts to create new bars to discharge under § 727(a), or to so distort a requisite element as to make it no element at all.
>
> "The essential point is that there must be something about the adduced facts and circumstances which suggest that the debtor intended to defraud creditors or the estate. For instance, multiple omissions of material assets or information may well support an

//

*inference of fraud* if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal."

*Khalil*, 379 B.R. 163, 174–75 (B.A.P. 9th Cir. 2007), *aff'd,* 578 F.3d 1167 (9th Cir. 2009) (citing *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 565 (Bankr. S.D. Cal. 1996)).

Plaintiffs have failed to establish, by a preponderance of the evidence, that the errors and omissions on the Debtor's initial petition and schedules were made "knowingly" and "fraudulently." The petition was filed under tremendous time pressure in response to Plaintiffs' efforts to enforce the Judgments. The Debtor was exhausted when the petition was filed because she had been working nonstop, seven days a week, for months in an attempt to earn enough money to save the Property. She was also emotionally drained, having recently experienced the death of her husband and the deteriorating health of her mother-in-law. Attorney Polston had "huge concerns" about the rapid filing necessitated by the circumstances, recognizing that such a filing would be "prone to errors."[61]

As more fully described in Section II, above, the Debtor provided testimony at the initial § 341(a) meeting of creditors that disclosed the majority of the material omissions and corrected the majority of the material errors in the schedules. Had the Debtor's intent been to conceal information, she would not have volunteered that information at the meeting of creditors. The circumstantial evidence, and the inferences which the Court may draw from the Debtor's conduct, show that the deficiencies in the initial schedules were the result of the Debtor's stress and exhaustion, not a fraudulent intent to withhold information from creditors.

To the extent that the Debtor's testimony at the initial meeting of creditors failed to disclose omissions or correct errors in the initial schedules, that was only because the relevant topics were not addressed. For example, the Debtor did not disclose at the initial meeting of creditors that she was a party to Mr. Bhogal's pending probate proceeding. However, at no time during the initial meeting was the Debtor asked about pending litigation to which she was a party. Further, the May 2022 Amendment disclosed the probate proceeding. Similarly, the Debtor's initial schedules did not disclose her total income from 2020 and 2021, and this information was not disclosed at the initial meeting of creditors, again because the topic not addressed. But the Debtor did testify at the initial meeting of creditors that she was "earning approximately $20,000 per month,"[62] and the Debtor's 2020 and 2021 income was disclosed in the May 2022 Amendment.

Plaintiffs make much of the fact that the Debtor failed to disclose the Chapter 11 petition of Chhatrala Grand Rapids, LLC ("Chhatrala"), filed in the Western District of Michigan on September 16, 2019, on her *Statement of Related Cases* form. The *Statement of Related Cases* form is *not* one of the Official Forms prescribed by the Judicial Conference of the United States pursuant to the authority granted by Bankruptcy Rule 9009. It is instead a local form issued pursuant to LBR 1015-2(b). Its primary purpose is to assist the Clerk of the Court in implementing General Order 11-01, which requires that a newly-filed "related case" (as defined by LBR 1015-2(a)) be assigned to the judge within the Central District of California who presided over the earlier-filed "related case." Because Chhatrala's case was filed in the Western

---

[61] Tr. at 123:7 (testimony of Polston).
[62] Plaintiff's Ex. 1 (Transcript of § 341(a) Meeting) at 2:12–13 (testimony of the Debtor).

District of Michigan, and could not be transferred to the Central District of California unless a motion seeking to change venue pursuant to 28 U.S.C. § 1412 were granted, the disclosure of Chhatrala's case would not have facilitated the primary purpose for which the *Statement of Related Cases* form was created. Consequently, the non-disclosure of Chhatrala's case was not material.

In addition, Polston testified that he believed that the Debtor was not required to disclose Chhatrala's filing on the *Statement of Related Cases*.[63] The Court need not determine whether Polston's understanding of the Debtor's disclosure obligations vis-à-vis Chhatrala was correct. Even if Polston was mistaken and the Debtor should have disclosed Chhatrala's Chapter 11 petition on the *Statement of Related Cases* form, the Debtor's non-disclosure was based upon the advice of counsel, and as such, was not fraudulent.

Obviously it would have been better for all concerned had the Debtor's initial petition and schedules been free of the numerous errors and omissions discussed herein. The facts, however, simply do not "suggest that the debtor intended to defraud creditors or the estate" or "support an inference of fraud." *Khalil*, 379 B.R. at 174–75. Denial of a debtor's discharge is among the harshest of remedies that this Court can impose. It is not warranted here.

### III. Conclusion

Based upon the foregoing, Plaintiffs have failed to establish that they are entitled to a judgment denying the Debtor's discharge under either § 727(a)(2)(A) or § 727(a)(4)(A). The Court will enter judgment consistent with this Memorandum of Decision.

###

Date: September 13, 2023

Ernest M. Robles
United States Bankruptcy Judge

---

[63] Tr. at 131:20–132:6 (testimony of Polston).